**ARBOR v. BLUE et al. (two cases).**

**Nos. 269, 270.**

Circuit Court of Appeals, Tenth Circuit.

Dec. 23, 1930.

D. H. Linebaugh and Paul Pinson, both of Muskogee, Okl., and Charles West, of Tulsa, Okl., for appellant Isabeth Arbor.

J. W. Field, of Sapulpa, Okl. (L. O. Lytle, of Sapulpa, Okl., and S. W. Maytubby, Jr., of Wewoka, Okl., on the brief), for appellants Emma Arbor, L. O. Lytle, J. W. Field, and H. U. Bartlett.

R. H. Hudson, of Bartlesville, Okl., for appellee Phillips Petroleum Co.

A. J. Biddison, of Tulsa, Okl. (Biddison, Campbell, Biddison & Cantrell, of Tulsa, Okl., on the brief), for appellees J. Q. Blue, Margay Oil Corporation, and Josey Oil Co.

C. H. Baskin and W. C. Farmer, both of Wetumka, Okl., for appellees H. H. Darks and other royalty owners.

Before PHILLIPS and McDERMOTT, Circuit Judges, and POLLOCK, District Judge.

McDERMOTT, Circuit Judge.

Caney Arbor was a quarter-blood Creek Indian, born on March 15, 1890. He was allotted the lands in controversy herein, and in May, 1908, negotiated a sale thereof to Vandiver and Diamond. Being then a minor, he could not make a valid conveyance. At that time it was erroneously believed that marriage of a minor relieved his disability, and a reprehensible practice had grown up

of arranging a marriage to validate the transfer of allotments by minors. On May 2, 1908, Caney married a woman who called herself Emma Johnson, and the bridal couple immediately repaired from the nuptial altar to the office of a notary public, and there consummated the marriage by signing a deed to his 120-acre surplus allotment. Later, and in August, 1908, Caney and his wife conveyed his 40-acre homestead allotment to the same purchasers. Caney died on December 16, 1910, still a minor, without issue, and intestate. His father had predeceased him. The 1908 deeds were entirely void, and as a consequence his allotment descended one-half to his widow and one-half to his mother. There were no restrictions against their conveyance, and accordingly his mother and a woman purporting to be his widow conveyed the allotment to W. D. Diamond, the widow's deed being dated December 23, 1910, and the mother's deed February 11, 1911. Diamond and those claiming under him have been in undisputed possession of the lands involved since 1908. It is incontrovertibly proven that the woman who, purporting to be Caney's widow, signed the 1910 deed was one Emma Mitchell, or Emma Anderson. It is likewise incontrovertible that she is the same person who signed the deed to the homestead in August, 1908. Whether she was Caney's wife, that is, whether she is the "Emma Johnson" who married him on May 2, 1908, is controverted by the appellant in No. 270. In 1925 oil was discovered upon the lands involved, and the properties became immensely valuable. Caney was dead; Emma Mitchell was dead; Caney's mother was dead; Vandiver and Diamond were dead; and Foster, the notary public, was a fugitive.

The stage was thus set for those who live by their wits. That Caney had been married was clear. A fortune awaited any woman who had not signed the 1910 deed and who could prove that she was the "Emma Johnson" of the marriage license, a fortune large enough to share with her advisers. If that one fact could be proven, the deeds signed by the real Emma Johnson could be done away with by a mere comparison of the handwriting of the genuine and the spurious. In a more settled community, proving one person to be another is a difficult and a dangerous thing to undertake; but in the shifting population of a new community, where the marriage was but one of convenience, the problem seemed not insurmountable. And the stake was large.

In June, 1926, one Minnie Riley and her daughter Susie, claiming respectively to be the widow and daughter of Caney Arbor, sued in the state courts to recover the lands in question and for an accounting; the suit was removed to the United States District Court, and thereupon six women filed intervening petitions, each claiming to have been the wife of this Creek boy of 18 years of age. The owners of the lands joined issue, denying that any of the women was ever married to Caney Arbor, setting up their own title predicated on the deeds of 1910 and 1911, signed by the actual widow and the mother; claiming title by prescription, and interposing the defense of laches. There were eight hearings had by the trial court, after which the court entered its decree finding "all the issues both law and fact" against each of the women so claiming, and dismissed the bill of complaint and each petition in intervention. The court decreed that the appellees who deraign their title through the deeds executed by the mother and widow after Caney's death are the owners, and that they or their predecessors have been for more than fifteen years the owners and in possession, of the interests claimed by them, and quieted their respective titles. But two of the women, styling themselves Isabeth Arbor and Emma Arbor, respectively, have appealed.

■ If this were an ordinary case, it would be shortly disposed of. At the threshold of each appeal stands the question of the integrity of the claim of marriage. Isabeth Arbor's claim stands almost alone upon her own testimony; Emma Arbor's claim stands on her own testimony and that of W. J. Birdsong, one of the active managers of her case, and the uncertain, vacillating, and unsatisfactory recollection of a negro preacher. Without any reference to contradictory evidence, the trial court who saw the witnesses as they testified would have been quite justified in declining to believe them, in light of the admitted circumstances, the inconsistencies and contradictions involved in their own testimony, and the fact that no claims were ever made until oil was discovered. Without the benefit of the trial court's finding, a reading of the record is convincing that the testimony adduced in support of these claims is largely false, and that their claims must fail. The finding of laches is supported by the evidence, and alone is fatal to the claims of appellants.

But this is not an ordinary case. It is not a case where mistakes have occurred in

the testimony of honest witnesses; it is not the case of perjury of a witness who is trying to dodge an honest answer; it is not even the case of perjured evidence adduced in support of a claim advanced in good faith. Bad as are these, this case is worse. There can be little doubt that these cases originated with a comprehensive plan to despoil property owners by wholesale perjury; and that, after the plan was conceived, the implements to carry it out were sought and found among the dregs of a distant city. That the plan was frustrated was partly by fortunate circumstance, and partly because the property owners were willing to expend many thousands of dollars in defense rather than in tribute. These appeals will receive separate consideration, not because of their merit, but because their nature is such that full exposure should be accorded them.

### The Appeal of Isabeth Arbor.

Isabeth Arbor is a negress living in Kansas City, Mo. She testified that she married a man going by the name of Caney Arbor in 1904, 1905, or 1906, at Muskogee, Okl.; that she was married according to the Indian laws or customs by an Indian preacher whose name she did not remember; that she was married in an open field, without a license; that it was a common-law marriage. In 1904 the Caney Arbor here involved was 14 years old; Isabeth was about 26. There was some effort at corroboration of her story by oral evidence, but it is so unsatisfactory, and in parts so contradictory, that no useful purpose will be served by a review of it. For example, two witnesses testified to seeing letters from Caney to Isabeth, which, if they existed, must have been written long after his death; and much of the corroboration was in identifying the photograph hereafter mentioned, as being of Caney and Isabeth. The documentary corroboration offered by Isabeth was a photograph she swore to be of herself and Caney, taken a few days after the marriage. The photograph is in the record, and is of a man in middle life, with a heavy moustache and other indications of maturity. Yet, according to the most favorable version of her testimony, Caney was either 14, 15, or 16 years old when the photograph was taken; according to another version, he was but 8 years old, for she testified she had "never seen Nebraska" before her marriage to Caney, and that she was in Omaha at the time of the Exposition, which was in 1898. No one having ever seen this boy wear a full moustache, Isabeth accounted for

it by saying it was a false moustache put on him in the photographic gallery by a friend who was anxious to conceal his identity. Caney's own brother denied it to be a photograph of Caney, and produced a photograph which he testified was of Caney, and which certainly is one of some immature young man. A lawyer who had defended Caney, and others, corroborated the brother. There is no similarity between the pictures. No one can look at the photograph identified by Isabeth and believe it is of a boy in his teens.

But that is but the beginning. Isabeth was asked point-blank on cross-examination:

"Q. Did you ever know a man by the name of Lampkin? A. No.

"Q. Did you ever go by the name of Lampkin? A. I never did.

"Q. Never heard of a man by that name? A. No, sir." [1]

Several months later the case was reopened for further evidence. In the interim the truth as to the photograph had been unearthed. The appellees produced several reputable citizens of Omaha, Neb., among them the president, the vice president, and the foreman of the Union Fuel Company of Omaha, all of whom identified the photograph as that of Mr. and Mrs. William Lampkins. They testified that Lampkins worked for their company as a teamster for years, and that intervener was the woman in the picture, and that she came to the office frequently to get the pay of her husband. Then William Lampkins himself was produced; he not only testified it was his photograph, but the trial court could see it was. Isabeth swore it was her picture, and the court could see it was, and yet she denied under oath that she ever knew, or ever heard of, a man by the name of Lampkins. Lampkins testified to his marriage at Omaha, in 1911, to intervener under the name of Lizzie Lee, the daughter of Aaron Evans and Clara Lightfoot, and produced the marriage license disclosing such facts. Isabeth testified her father's name was Aaron Evans and her mother's name was Clara Lightfoot. Lampkins identified intervener as his wife.

There was another continuance and another hearing. Isabeth then produced a lawyer from Kansas City, Mo., one George T. Wassom. He testified that Isabeth brought a criminal proceeding to collect a board bill from William Lampkins, whom Wassom identified, and that the witness defended

---

[1] Throughout the record and briefs Lampkin and Lampkins are used interchangeably.

Lampkins in that case; that in that case Isabeth testified she had never been married to Lampkins, and Lampkins testified he was married to another negress, who called herself Lizzie Lampkins. Isabeth then produced as a witness a negress who said her maiden name was Lizzie Lee, who testified it was she who married Lampkins in Omaha in 1911, and not Isabeth. She denied that the photograph was of herself or Lampkins. Later she testified her maiden name was Sayers. She denied ever having heard of the Union Fuel Company or any of its officers, and flatly contradicted the reputable witnesses from Omaha, the officers of the Union Fuel Company.

Isabeth then again took the stand and testified that she did know Lampkins, but only as a roomer; that the marriage license, which correctly described the name of her parents, was a "frame-up." But from this point on, the contradictions in her own testimony are too numerous to record.

Appellees then produced an affidavit made in a court proceeding in Missouri, signed by intervener, as Elizabeth Lampkins, in which she swore she was the wife of William Lampkins; they offered in evidence a great many letters found in a trunk of intervener addressed to Mrs. Lampkins, several of them being from the witness William Lampkins, and many receipts issued to her as Mrs. Lampkins; the police officers of Kansas City readily identified intervener as Mrs. Lampkins, and also her husband, with verifying records; and a host of disinterested witnesses from both Omaha and Kansas City took the stand and identified intervener as Mrs. Lampkins.

This is sufficient to indicate the labyrinth of perjury in which Isabeth Arbor, her advisers and witnesses, found themselves before they were through. It was possible for Isabeth to have gone through a marriage ceremony with a boy of fourteen or fifteen, in 1904 or 1905, and to have thereafter married Lampkins. But in order to buttress her fragile claim of the informal marriage with the boy, she introduced the photograph. That she did in fact marry Lampkins, and that the photograph is of Lampkins and herself, is proven beyond the shadow of a doubt; that she perjured herself is likewise clear. Her own counsel, on this appeal, say that "she probably lied on the witness stand." The trial court was therefore entirely right in dismissing any claim which was based upon and supported by this saturnalia of perjury; he would have been justified in issuing bench warrants for the apprehension of those engaged therein.

### The Appeal of Emma Arbor.

The negress styling herself as Emma Arbor is a peripatetic prostitute, who testified that she had pursued that unsavory occupation as she followed railroad camps from one state to another; as a side line she bootlegged whisky and peddled narcotics; asked if she "ever did anything to make an honorable living" she replied, "Yes, bootlegged and run a cafe." She testified to a dozen names used by her, and could recall a number of cities where she had been incarcerated. But none of the many names adopted by her was "Arbor"; she testified that "she never did go under the name of Emma Arbor only when she married Caney Arbor." Asked if she ever lived with him, she answered, "Just around with him to a room and out in the weeds." She testified she sometimes went under the name of "Emma Johnson," although her father's name was Moss; and she was never married to a Johnson. She admitted that her personal record, at the Kansas penitentiary, disclosed a marriage in 1900 to one Winton, and a subsequent marriage to one Virgil in 1917; but such record discloses no marriage to Caney Arbor.

She testified that under the name of Emma Johnson she married Caney on May 2, 1908, and produced a marriage license therefor, with a certificate thereon by Oscar A. Williams, a negro Presbyterian minister and a doctor of medicine, that he had performed the ceremony. The certificate bore the signatures of J. W. Foster and W. J. Birdsong as witnesses. That Caney married some woman that day is conceded; was it the intervener? One of the witnesses, Foster, is a fugitive, and was not available. The minister did not at first recall the marriage, but testified that "after Birdsong refreshed my memory about some things," and he had seen his signature, he remembered that he had performed the ceremony and many details thereof, but as to identity he testified, "I don't know whether she is, looks like the one, but she resembles the one, as near as I can remember. She resembles one of that type." He testified the woman was not "Emma Mitchell." He had never seen either Caney or Emma before the ceremony, nor since until he saw Emma after this case arose; the ceremony was brief, and his failure to positively identify a woman he had seen but once and then only for a few minutes, after a lapse of twenty years, is not surprising.

Birdsong, who was actively interested in the intervener's case, testified positively as to identity, and to other circumstantial detail. There was another witness, H. R. Shears, present at the wedding and at the execution of the deed that took place immediately after, and he is just as positive it was not the intervener. There were other witnesses as to relations between intervener and Caney, but, considering her confessed business, such testimony is no proof of marriage. Other witnesses testify that Caney referred to her as his wife; such testimony does not ring true, but, if true, it is proof of nothing except an explanation by Caney for his relations with her. If the case began and ended with these witnesses, together with the admitted · fact that intervener made no claim to his property or his name since the day of the alleged marriage until this case arose, and that another woman, claiming to be his wife, was signing deeds with him and was recognized as his widow after his death, the trial court would have been justified, if not compelled, to dismiss her claim. But circumstance intervened, and proof, demonstrative in character, denies the integrity of the claim.

Emma Johnson first testified on the hearing upon the application for the appointment of a receiver, in May, 1927. At that time the original of the deed of May 2, 1908, could not be found. The deeds of August, 1908, and December, 1910, were available. She testified she did not sign either of these two later deeds, as of course she did not, and exhibited specimens of her handwriting to prove it. The two later deeds were signed by the same person, and the evidence is conclusive, in fact not denied, that such person was Emma Mitchell. It was necessary for the intervener to deny the execution of the December, 1910, deed for otherwise her claim would have passed with it. It was likewise necessary for her to deny the signature to the deed of August, 1908, because it was in existence, and disclosed an identity of signatures with the 1910 deed. But the deed of May 2, 1908, need not be denied, for it was not available, and, moreover, it is conceded on all hands that one of the purposes, if not the primary one, for the marriage was to enable the allotment to be conveyed. Emma Johnson testified that immediately after the marriage she went to the office of J. W. Foster, signed a paper, and received $100 therefor, and that Birdsong and Shears signed it as witnesses. Birdsong likewise testified that he saw intervener sign the deed; and that he affixed his signature thereto as a witness. It is therefore incontrovertible that the woman who was married to Caney on May 2, 1908, signed the deed of May 2, 1908.

Nearly a year later the deed of May 2, 1908, was accidentally discovered. It was acknowledged before Foster, and witnessed by Birdsong and Shears. But the woman who signed it was not the intervener. She admits she did not sign it; her counsel concede she did not; her experts on handwriting testify she did not, and this court can see she did not. But where does that leave the intervener? She testified she married Caney and immediately thereafter signed a paper in Foster's office; Birdsong, her chief witness, testified he saw the intervener sign the deed that day and that he signed as a witness, and his signature on the marriage certificate is identical with his signature as a witness to the deed; he testified he witnessed no other woman sign that day as Mrs. Arbor. Intervener's claim is therefore false; the woman who married Caney Arbor was the woman who immediately thereafter signed the deed, for that was the reason for the marriage, and any other assumption is preposterous. And that woman was not the intervener.

There is other and affirmative proof. A letter was found, conceded to be in the handwriting of Emma Mitchell. A comparison of handwritings shows conclusively that Emma Mitchell signed all three deeds. At the trial, a handwriting expert was asked whether the person who wrote the Emma Mitchell letter signed all three of the deeds. Counsel for Emma Johnson interposed, "I think, if the court please, we can all agree that that is correct, and save time." The court said, "Well, that seems to eliminate that." Later in the trial, after one of appellant's experts had changed his mind, counsel undertook to claim Emma Mitchell did not sign it; but there is little to support this claim, and the great weight of proof is to the contrary. But, if Emma Mitchell did not sign it, it avails intervener nothing; she admits she did not sign it; her experts testify she did not; her counsel, both in the court below and here, concede she did not. And, if she did not sign the deed of May 2, 1908, she is not the woman who married Caney that day, and she has no claim to his property. All the handwriting experts, on both sides, conceded Emma Mitchell signed the last two deeds; all conceded that intervener signed none of them; all the experts at first agreed that Emma Mitchell signed the deed of May 2, 1908; one of the experts for intervener later changed his mind on this point; but we have examined the instruments, and all of the evidence, and are entirely satisfied with the find-

ing of the trial court that Emma Mitchell, and not the intervener, signed all of the deeds, including the one of May 2, 1908. The conclusion is therefore irresistible that it was she who married Caney Arbor on May 2, 1908. It follows that the trial court's decree is in all respects correct, and should be and is affirmed.

To permit the things which have transpired in this case to pass unchallenged would be a reproach to our jurisprudence. That persons exist and are at liberty who will deliberately attempt, by the use of perjured evidence, to despoil owners of their property, is a threat to the owner of every farm and home in Oklahoma. If it has not already been done, the trial court is directed to summons a grand jury for the purpose of sifting thoroughly every angle and side of this case, to the end that, if there has been perjury by witnesses, or subornation thereof, by counsel or others, those guilty thereof shall be punished. Particular attention should be paid to subornation, for intelligence that procures and directs is more guilty than ignorance which carries out. The trial court is further directed to cause a prompt investigation to be made of the conduct of counsel in the case to the end that, if guilty of knowingly using perjured evidence, their licenses to practice in the United States courts of Oklahoma and in this court shall be revoked; if counsel are adjudged guilty, a transcript of the proceedings should be furnished to the body having disciplinary authority over the practice of the profession in the state courts.

Affirmed in case No. 269.

Affirmed in case No. 270.